

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES OF AMERICA,

    -against-

ROCKIME WILLIAMS,

                Defendant.
-------------------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. 07-CR-651

*Appearances:*
For the United States of America:
BENTON J. CAMPBELL, ESQ.
United States Attorney
Eastern District of New York
By: MATTHEW AMATRUDA, ESQ.
    Assistant United States Attorney
271 Cadman Plaza East
Brooklyn, New York 11201

For Defendant:
HARRY C. BATCHELDER, JR., ESQ.
40 Wall Street, 61st Floor
New York, NY 10005

**BLOCK, Senior District Judge:**

    Rockime Williams is charged with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). He moves to suppress the firearm seized from his person by law enforcement on the ground that the seizure violated the Fourth Amendment. An evidentiary hearing was held on March 12, 2008. For the following reasons, the motion is denied.

I

    The sole witness at the evidentiary hearing was New York City Police Officer Melchor Alban ("Alban"); his version of events leading up to Williams' arrest is as follows:

    On August 5, 2007, Alban was on foot patrol in uniform at the corner of Pennsylvania Avenue and Livonia Avenue in East New York, Brooklyn. At approximately 8:40 p.m., he received a radio report of a man with a gun at 673 New Jersey Avenue; the

report was based on an anonymous 911 call and described the man as "black, bald head, blue shirt, blue shorts, white sneakers." Tr. at 8.[1]

Alban and several other nearby uniformed officers, including Alban's sergeant, reported to the scene. When they arrived, an unidentified man approached them and said that "the man with the guns [sic] was still upstairs." *Id.* at 10. Alban's sergeant and three other officers searched the building, but did not find anyone matching the report's description. Alban's sergeant instructed the other officers to resume their respective patrols.

Alban began walking up New Jersey Avenue, but stopped to talk to two junior officers. Less than five minutes later, he saw a man come out of 673 and begin walking in Alban's direction "with his head down [and] walking at a very fast pace." *Id.* at 14. The man – later identified as Williams – matched the description given in the radio report. Alban and another officer ("DeSousa") hid behind a car parked on the street.

From his vantage point, Alban noticed that two other officers were "walking behind [Williams] calling him to stop." *Id.* at 16. Williams ignored the calls and "kept walking in [Alban's] direction with his head down." *Id.* at 17.

As Williams approached, Alban testified that he saw "a silver object near his waistband." *Id.* at 18. On direct examination, he testified that he was able to see the object even though Williams' untucked shirt reached two or three inches below the waistband of his shorts because Williams "was walking at a very fast pace and I guess the wind took it

---

[1]"Tr." refers to the transcript of the March 12th evidentiary hearing.

2

and his shirt started to ride up." *Id.* On cross examination, however, Alban retreated from this story:

> Q. Now, you stated just a few minutes ago that the wind was blowing sufficient that it raised that shirt up so that you could see something silver underneath that shirt, is that your testimony, Officer?
>
> A. No, I didn't say the wind, I said from him walking towards me at a face pace his shirt rode up.
>
> Q. Is it your testimony that you never said that the wind took his shirt and started to ride it up, yes or no?
>
> A. I don't remember from this point.

*Id.* at 29. Instead, Alban testified that "[i]t could have been a couple of factors," including Williams' "body movement" and "the wind from how he was walking." *Id.* at 30.

When Williams reached Alban's position, Alban stepped out from behind the parked car and said, "Sir, don't move; sir, come here," *id.* at 19; Williams kept walking. Alban then grabbed Williams' right arm; in response, Williams "shoved [Alban] and started to run." *Id.* Alban, DeSousa and the two officers who had been following Williams chased him for a little less than two blocks, at which point Williams "stopped and . . . started to turn around . . . to see where [the officers] were." *Id.* at 21-22.

Alban described Williams' next action as "looking like he was reaching for something" in his waistband. *Id.* at 22. At that point, Alban and Dousa knocked Williams to the ground. When Alban grabbed Williams' left arm to in an effort to restrain him, he "heard something fall." *Id.*

A statement prepared by a legal assistant in the district attorney's office

3

recited that a silver nine-millimeter handgun gun was recovered "from the ground where the defendant threw it." *Id.* at 35. A statement prepared by one of Alban's fellow officers stated that Alban "observed a gun fall out of William's hand." *Id.* at 43. Alban denied telling anyone either that Williams had thrown the gun or that it had fallen from his hand; his testimony at the suppression hearing was simply that the object he heard fall "was a silver nine-millimeter dropped right next to [his] left leg." *Id.* at 22.

## II

The Fourth Amendment's proscription on unreasonable seizures generally prohibits a police officer from seizing an individual absent probable cause to believe that "an offense has been or is being committed by the person to be arrested." *Dunaway v. New York*, 442 U.S. 200, 208 & n.9 (1979) (citations, internal quotation marks and alterations omitted). In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court carved out a limited exception from this general rule and held that "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30).

Whether the substantive standard for a particular detention is probable cause or reasonable suspicion, a court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). The court must view the circumstances leading up to the seizure "from the standpoint of an objectively reasonable police officer,"

4

*Ornelas v. United States*, 517 U.S. 690, 696 (1996), and must allow for "commonsense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 125 (citing *Cortez*, 449 U.S. at 418).

Williams' interaction with law enforcement unfolded in three stages: (1) the unobeyed orders to stop from the officers following Williams up New Jersey Avenue, (2) Alban's order to "come here" and subsequent grabbing of Williams' arm, and (3) the pursuit and eventual tackling of Williams. The Court evaluates each stage in turn.

## A. Orders to Stop

The principal basis for Williams' motion to suppress is his argument that the anonymous 911 call did not supply even reasonable suspicion for a *Terry* stop, let alone probable cause for an arrest. In *Florida v. J.L.*, 529 U.S. 266 (2000), the Supreme Court addressed a similar anonymous tip that "a young black make standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *Id.* at 268. Responding to the tip, officers found an individual matching that description at the bus stop, but did not see a gun; however, the officers frisked the individual and found a gun in his pocket. *See id.*

Reviewing the stop, the Supreme Court acknowledged that the tipster's description of the defendant and his location were corroborated by the officers' own observations; however, the Court explained that reasonable suspicion "requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* at 272. On that key issue, "[a]ll the police had to go on ... was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L.," *id.* at 271;

the Court held that "an anonymous tip lacking [such] indicia of reliability . . . does not justify a stop and frisk whenever and however it alleges the illegal possession of a firearm." *Id.* at 274.

Thus, Williams is clearly correct that the officers could not have stopped him upon seeing him leave the building. As in *J.L.*, the anonymous tip's allegation of gun possession bore no indicia of reliability and was not immediately corroborated by the officers' own observations. *See also United States v. Muhammad*, 463 F.3d 115, 122 (2d Cir. 2006) ("[I[f the officers who stopped and frisked Muhammad had done so solely on the basis of the report made by the anonymous caller [that "a black man, attired in a white sweat suit and carrying a gun, was riding a bicycle" in a particular location], they would have had an insufficient basis for a *Terry* stop because their suspicions would be deemed unreasonable.").

It is equally clear, however, that no such stop occurred. The Supreme Court has stated that a "seizure" under the Fourth Amendment "requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority." *California v. Hodari D.*, 499 U.S. 621, 626 (1991). Based on *Hodari D.*, the Second Circuit has reluctantly held that an unobeyed order to stop – no matter how unreasonable -- is not subject to Fourth Amendment scrutiny: "Regardless of how unreasonable it was for the officers to *order* him to pull over, and regardless of how reasonable it was for Swindle to have felt restrained in the face of the flashing police strobe light, there was no immediate 'physical force' applied or 'submission to the assertion of authority.' Therefore, no seizure immediately occurred." *United States v. Swindle*, 407 F.3d 562, 572-73 (2d Cir. 2005) (quoting *Hodari D.*, 499 U.S. at

626). As a result, "the grounds for a stop may . . . be based on events that occur after the order to stop is given." *Id.* at 568.

**B. First Seizure**

Williams was unequivocally "seized" when Alban grabbed his arm. *See Hodari D.*, 499 U.S. at 626 ("The word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful."). By that point, the government contends, Alban had personally observed a silver object in Williams' waistband. The Court, however, does not credit that aspect of Alban's testimony. By Alban's own admission, Williams' shirt reached two or three inches below his waistband. His initial explanation that he was nevertheless able to see the object because "the wind took it" struck the Court as implausible, a concern that was magnified by his unwillingness to stand by that testimony on cross examination. In sum, Alban's inability to articulate a plausible, consistent explanation convinced the Court that he did not see a silver object before grabbing Williams' arm.

The government also points out that Alban had seen Williams walking at a fast pace with his head down, and that he continued to do so despite calls to stop from the officers behind him. "An individual approached by an officer who has no reasonable suspicion of wrongdoing may ignore the officer and go about his business, and his refusal to cooperate may not form the basis for his detention," *Muhammad*, 463 F.3d at 123 (citing *Florida v. Royer*, 460 U.S. 491, 498 (1983)); however, "unprovoked flight is simply not a mere refusal to cooperate," *Wardlow*, 528 U.S. at 125, and "[h]eadlong flight . . . is certainly suggestive of [wrongdoing]" *Id.* More generally, "nervous, evasive behavior is a pertinent

7

factor in determining reasonable suspicion." *Id.* at 124.

If there is to be a meaningful right to go about one's business, simply continuing to walk away from a police officer cannot possibly be considered "headlong flight." Whether Williams' pace and body language can reasonably be characterized as nervous or evasive is a closer question. On the one hand, he did not change his speed or direction, factors which courts have relied on in describing behavior as suspicious. *See, e.g., United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975) ("[E]rratic driving or obvious attempts to evade officers can support a reasonable suspicion."); *Muhammad*, 463 F.3d at 119 (affirming finding of reasonable suspicion where suspect on bicycle increased speed, tried to pass one patrol car and steer around another). On the other hand, maintaining a quick pace with one's head down is at least slightly more suspicious than just "calmly walk[ing] away." *United States v. McCrae*, 2008 WL 115383, at *3 (E.D.N.Y. Jan. 11, 2008) (finding no reasonable suspicion).

In the end, the Court need not decide whether Williams' behavior justified Alban grabbing his arm because the gun was not recovered during that seizure. As Justice Scalia explained in *Hodari D.*:

> To say that an arrest is effected by the slightest application of physical force, despite the arrestee's escape, is not to say that for Fourth Amendment purposes there is a *continuing* arrest during the period of fugitivity. If, for example, Pertoso had laid his hands upon Hodari to arrest him, but Hodari had broken away and had *then* cast away the cocaine, it would hardly be realistic to say that that disclosure had been made during the course of an arrest.

499 U.S. at 625. By breaking free of Alban's grasp, Williams rendered the legality of that

seizure an irrelevancy. *See United States v. Chin*, 859 F. Supp. 48, 51 (E.D.N.Y. 1994) ("The defendant's flight, and subsequent violations of the law were not foreseeable, and constituted intervening acts free of the initial taint associated with the [unconstitutional] stopping of his vehicle on Livonia Street."); *see also United States v. Dawdy*, 46 F.3d 1427, 1430-31 (8th Cir. 1995) (holding that "a defendant's response to even an invalid arrest or *Terry* stop may constitute independent grounds for arrest," and citing cases reaching the same conclusion from the Fifth, Ninth, Tenth and Eleventh Circuits).

### C. Second Seizure

Williams does not dispute that he ran away following the first seizure. *See* Aff. of Rockime Williams (Jan. 14, 2007), ¶ 4 ("When I saw [uniformed police officers] coming, I started running down Riverdale towards Pennsylvania."). While his prior behavior may not have been suspicious, this falls squarely within the category of "headlong flight." Even assuming that Williams did not, as Alban testified, turn and reach for an object in his waistband, his flight – coupled with Alban's knowledge that Williams had been at 673 New Jersey Avenue and fit the description given in the 911 call – provided at least a reasonable suspicion sufficient to justify the second seizure.

The discovery of a gun during that seizure, in turn, provided probable cause for the arrest. Any inconsistencies in Alban's testimony as to the precise manner in which the gun ended up on the ground, while perhaps relevant to credibility, are otherwise immaterial because the gun would undoubtedly have been discovered during the protective frisk attendant to a *Terry* stop. *See Adams v. Williams*, 407 U.S. 143, 146 (1972) ("'When an officer is justified in believing that the individual whose suspicious behavior

9

he is investigating at close range is armed and presently dangerous to the officer or to others,' he may conduct a limited protective search for concealed weapons." (quoting *Terry*, 392 U.S. at 24)).

### III

Had Williams submitted to the first seizure, he would have a strong argument that any evidence discovered during that detention should be suppressed. By instead fleeing, he provided the necessary justification for the second seizure. The motion to suppress is denied.

**SO ORDERED.**

s/FB

FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
October 16, 2008